# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THOMAS H. IBBISON, | ) | 3:22-CV-01163 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ANGEL QUIROS *et al.*, | ) | |
| *Defendants*. | ) | February 3, 2023 |

## <u>INITIAL REVIEW ORDER</u>

In this prisoner civil rights action, Plaintiff Thomas H. Ibbison, who is currently incarcerated and proceeding *pro se*, seeks relief under 42 U.S.C. § 1983 against sixty-two Defendants: Commissioner Angel Quiros, District Administrator Rodriguez, Director of Security Santiago, Warden Kristen Barone, Officer Bauza, RN Doe 1, RN Allison Hill, Doe 2, RN Yvonne M. Marceau, Lieutenant Studalnik, RN Janine Brennan, Officer Harvey, Officer Daniele, Officer Swol, Officer Konopelski,[1] Officer Stone, Officer Vazquez,[2] Officer Reynoso, APRN Dawn Lee, Doe 3, RN Shayna Graham, Dr. Syed Johar Naqvi, Doe 4, Dr. Zaidi, Doe 5, Doe 6, Officer Ericson, Doe 7, Doe 8, Doe 9, Doe 10, RN Gwen Hite, RN Dave M. Anglade, RN Danielle Scott-Mailloux, RN Prince Asmah, LPN Michelle E. McDonald, Dr. Omprakash B. Pillai, Doe 11, C.S. Dow, Officer Melendez, Captain Danik, Deputy Warden Doran, Deputy Warden Maldonado, Deputy Warden Ogando, RN Gina Burns, Lieutenant Scagliarni, Captain Salius, Lieutenant Rule, Officer Santangelo, Officer Jacovino, Doe 12, Doe 13, Officer Bennett, Officer Outar, Officer Favreau,

---

[1] Although listed in the caption as Officer Konodelski, this defendant is referred to in the description of the parties as Officer Konopelski. The Court assumes that the case caption contains a typographical error.

[2] Although listed in the caption as Officer Vazquel, this defendant is referred to in the description of the parties as Officer Vazquez. The Court assumes that the case caption contains a typographical error.

RN Laura, Doe 14, Officer Lohmann, Dr. Brian Rader, Lieutenant Titus, Lieutenant Dumas, and Lieutenant Bragdon.

Plaintiff asserts three claims most easily identified by location and time period: (1) a claim against officials at Corrigan Correctional Institution ("Corrigan") and Walker Correctional Institution ("Walker") alleging excessive force, failure to intervene, retaliation, intentional and negligent infliction of emotional distress, and deliberate indifference to his medical needs, health, and safety occurring between October of 2019 and August of 2020; (2) a claim alleging deliberate indifference and excessive force resulting from an incident that occurred during his confinement at Walker in December of 2020; and (3) a claim alleging deliberate indifference and excessive force resulting from an incident at Walker in May of 2021. Plaintiff seeks damages and injunctive relief from all Defendants in their individual and official capacities.

## I.      STANDARD OF REVIEW

Under 28 U.S.C. § 1915A, the Court must review civil complaints filed by prisoners and dismiss any portion of a complaint that "(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." *See* 28 U.S.C. § 1915A(b)(1)–(2). Although highly detailed allegations are not required, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. This plausibility standard is not a

2

"probability requirement," but imposes a standard higher than "a sheer possibility that a defendant has acted unlawfully." *Id.*

In undertaking this analysis, the Court must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). The Court, however, is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions," *id.*, and "a formulaic recitation of the elements of a cause of action will not do," *Iqbal*, 556 U.S. at 678. Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

It is well-established that submissions of *pro se* litigants are "reviewed with special solicitude, and 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Matheson v. Deutsche Bank Nat'l Tr. Co.*, 706 F. App'x 24, 26 (2d Cir. 2017) (summary order) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir. 2006) (per curiam)). *See also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" (internal citations omitted)). This liberal approach, however, does not exempt *pro se* litigants from the minimum pleading requirements described above; a *pro se* complaint still must "state a claim to relief that is plausible on its face." *Mancuso v. Hynes*, 379 F. App'x 60, 61 (2d Cir. 2010) (summary order) (quoting *Iqbal*, 556 U.S. at 678). Therefore, even where a plaintiff is proceeding *pro se*, the Court may not

"invent factual allegations" that the plaintiff has not pleaded. *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010).

## II.      FACTUAL BACKGROUND

Plaintiff includes three counts in his complaint and alleges separate facts for each count. The facts set forth in Plaintiff's complaint are accepted as true for purposes of this initial review. *See Dehany v. Chagnon*, No. 3:17-cv-00308 (JAM), 2017 WL 2661624, at *3 (D. Conn. June 20, 2017) (for purposes of section 1915A review, a court "must accept as true all factual matters alleged in a complaint").

### A.   Count One

On October 5, 2019, Plaintiff was arrested and committed to the custody of the Connecticut Department of Correction ("DOC"). *See* Compl., ECF No. 1, ¶ 64.  At the time of his intake at Corrigan, RN Doe 1 assessed Plaintiff's medical needs. *Id.* ¶ 65.  Plaintiff told RN Doe 1 that he was seen at Backus Walk-In Clinic and was being treated at Norwich Orthopedic Group for a shoulder separation and labrum tear, and that these injuries caused him severe constant pain and loss of use affecting his daily activities. *Id.* ¶ 66.  Although Plaintiff insisted that he had been told that he needed surgery on his right shoulder, RN Doe 1 did not order any pain management for Plaintiff or refer him to a doctor. *Id.* ¶ 67.

On October 12, 2019, Plaintiff submitted an inmate request stating that his incarceration was preventing his treatment by Norwich Orthopedic Group, describing his pain and need for surgery, and seeking medical care. *Id.* ¶ 68.  On October 15, 2019, RN Hill saw Plaintiff at sick call, but she did not conduct a proper examination of Plaintiff's shoulder and did not provide him with any pain management. *Id.* ¶ 69.  Plaintiff and RN Hill signed releases for Plaintiff's medical

records.  *Id.* ¶ 70.  Although RN Hill stated that she would put Plaintiff on the list to see a doctor, she did not do so.  *Id.*

On October 29, 2019, Plaintiff submitted another medical request describing his pain and asking to see a doctor; on October 31, 2019, however, Doe 2 put Plaintiff on the sick-call list instead of the list to see a doctor.  *Id.* ¶ 71.  On November 6, 2019, RN Marceau saw Plaintiff at sick call and gave him low dose Motrin instead of a "meaningful pain reliever prescription."  *Id.* ¶ 72.  At the time, RN Marceau told Plaintiff that she would arrange for him to see a doctor, but she did not do so.

On November 12, 2019, Lieutenant Studalnik directed Plaintiff to leave his cell and led him to the sallyport under the pretense that he wanted to speak to Plaintiff.  *Id.* ¶ 73.  In the sallyport, Officer Reynoso "slammed" Plaintiff into the wall and "yanked" his arm up behind his back, ignoring Plaintiff's complaints that he had an injured shoulder and that Officer Reynoso was causing him severe pain.  *Id.* ¶ 74.  Lieutenant Studalnik did not intervene.  *Id.*  Later, on the way to restrictive housing, APRN Lee took Plaintiff to the medical unit for assessment of his injuries.  *Id.* ¶¶ 75–76.  Although Plaintiff displayed great discomfort from the restraints applied to him and stated that Officer Reynoso had injured him, APRN Lee refused to examine his shoulder or provide any treatment.  *Id.* ¶ 77.  A medical incident report was generated regarding the injury Plaintiff sustained due to Officer Reynoso's use of force against him in the sallyport.  *Id.* ¶ 78.

On November 14, 2019, two days after the incident in the sallyport, Plaintiff was taken for x-rays due to his constant complaints to correctional staff that he was in pain.  *Id.* ¶ 79.  The x-rays showed that Plaintiff had suffered a grade 4 A/C joint separation with a "5mm calcified density likely within the bicep tendon sheath."  *Id.*  At that time, Plaintiff still had not been examined.  *Id.*

5

On or about November 28, 2019, Officer Reynoso stopped Plaintiff as he was returning from the dining hall.  *Id.* ¶ 80.  Officer Reynoso threatened and harassed Plaintiff because RN Hill had generated an incident report regarding the November 12, 2019, incident.  *Id.*

On November 30, 2019, Plaintiff was transferred to Walker.  *Id.* ¶ 81.  When he was assessed at Walker, Plaintiff reported his constant pain, asked to be seen by a doctor, and requested an MRI.  *Id.* ¶ 82.  Doe 3 did nothing in response to Plaintiff's requests.  *Id.*  On December 7, 2019, Plaintiff submitted another inmate request seeking treatment.  *Id.* ¶ 83.  Doe 3, who was responsible for receiving and triaging Plaintiff's request, ignored Plaintiff's pleas for treatment. *Id.*  On or about January 15, 2020, Plaintiff was seen by Dr. Naqvi.  *Id.* ¶ 84.  Dr. Naqvi refused to review the x-rays taken on Plaintiff's shoulder on November 14, 2019, and instead ordered that new x-rays be taken.  *Id.*  Although the new x-rays confirmed Plaintiff's injuries, Dr. Naqvi provided no meaningful medical care to Plaintiff.  *Id.* ¶ 85.  Plaintiff wrote another request for medical care on February 11, 2020, but Doe 3 again ignored this request.  *Id.* ¶ 86.

On February 27, 2020, Plaintiff was seen by RN Graham, but she did not provide him with any treatment or pain management.  *Id.* ¶¶ 86–87.  Instead, she told Plaintiff to "limit the use" of his right arm, despite Plaintiff telling her that he was being forced to stay on a top bunk and that this placed him at risk.  *Id.* ¶ 87.  Dr. Naqvi saw Plaintiff for a second time on March 9, 2020.  *Id.* ¶ 88.  At that time, Dr. Naqvi refused to provide Plaintiff with treatment or pain management, denied Plaintiff a bottom bunk pass, and told Plaintiff to "limit use" of his right arm, which is his dominant arm.  *Id.*  Plaintiff continued to complain about his placement in a top bunk, but he was not issued a bottom bunk pass until May 29, 2020.  *Id.* ¶ 89.

6

Plaintiff believes that an order for an orthopedic consult was forwarded to Does 4, 5, and 6—members of the Patient Prioritization and Transportation ("P.P.T.") team who were responsible for scheduling the appointment and arranging Plaintiff's transportation—but these Defendants refused to arrange such care for Plaintiff. *Id.* ¶ 90.  On June 3, 2020, Dr. Naqvi again refused to provide treatment to Plaintiff and instead advised him to limit use of his dominant arm. *Id.* ¶ 91. At that time, Dr. Naqvi stated that he was waiting for the orthopedic consult. *Id.*  On June 12, 2020, Plaintiff had a telemedicine visit with Dr. Mazzocca of the University of Connecticut ("UConn"). *Id.* ¶ 92.  Dr. Mazzocca ordered an MRI after confirming that Plaintiff's x-rays showed a grade 4 A/C joint separation, reverse Hill-Sachs deformity, and mild interior glenohumeral joint separation. *Id.*

On June 25, 2020, Plaintiff underwent an MRI, which showed that his shoulder had a "chronic widening of the A/C joint measuring 18mm with disruption of the A/C joint capsule/ligaments." *Id.* ¶ 94.  The MRI also showed "widening of the [coracoclavicular] interval with thinning/[avulsion] at the [clavicle] attachment of the conoid and trapezoid ligaments," a "type 2 large tear of the posterior glenoid labrum extending from the posterior interior labrum to the posterior superior labrum," "small adjacent para labral cysts measuring up to 1.0 cm," and "irregularity involving the posterior inferior glenohumeral ligament with pericapsular edema." *Id.*

On July 28, 2020, Plaintiff underwent surgical repair of the labrum in his right shoulder, but not his A/C joint, due to constant dislocation. *Id.* ¶ 95.  The post-operative instructions provided to Plaintiff included keeping his dominant arm in a sling for six weeks, twelve weeks of strengthening, twice weekly physical therapy, and directions to not reach behind his back or forcefully pull his arm across his chest for twelve weeks. *Id.* ¶ 96.  Plaintiff stayed in the

MacDougall-Walker Correctional Institution ("MacDougall") infirmary for two weeks until Dr. Naqvi discharged him.  *Id.* ¶¶ 97–98.  When he discharged Plaintiff, Dr. Naqvi ignored that Plaintiff would not have assistance to perform daily tasks and that keeping his dominant arm in a sling for six weeks would put him at risk of harm from inmates and staff.  *Id.*  Plaintiff thereafter received only two physical therapy visits because Does 4, 5, and 6 refused to schedule any additional visits.  *Id.* ¶ 99.  Plaintiff alleges that he was unable to adequately rehabilitate his shoulder from the surgery due to Defendants' actions and inaction.  *Id.* ¶¶ 100–02.

      B.  <u>Count Two</u>

On December 6, 2020, when Plaintiff was housed at Walker, Lieutenant Scagliarni came to Plaintiff's cell and asked him to step into the hall to speak with him.  *Id.* ¶¶ 106–07.  When Plaintiff entered the hallway, Officers Ericson and Swol forced his arms behind his back, handcuffed him, and employed reverse wrist locks while "shoving" his arm up toward his shoulder from behind in contradiction to Plaintiff's medical orders.  *Id.* ¶ 108.  Lieutenant Scagliarni and Officers Ericson and Swol then began to escort Plaintiff to the admissions and property area.  *Id.* ¶ 109.  Plaintiff was compliant but complained to Scagliarni, Ericson, and Swol—as well as Officer Bauza, who was operating the camera in that area—that he was in extreme pain because of his recent shoulder surgery and the tight handcuffs; Plaintiff told them that his arms were not supposed to be behind his back.  *Id.* ¶ 110.  RN Anglade, the medical representative responsible for ensuring Plaintiff's restraints were consistent with his medical condition and not causing Plaintiff harm, ignored Plaintiff's requests for assistance.  *Id.* ¶ 111.

While Plaintiff was explaining his recent surgery to Lieutenant Scagliarni, and while his arms were restrained, Officers Ericson and Swol forcefully "slammed" Plaintiff to the floor face-

first. *Id.* ¶ 112.  Plaintiff was unable to protect himself, and the officers did nothing to protect him. *Id.* ¶¶ 112–13.  Plaintiff suffered a gash to the "temple region of his left eye," sustained injuries to his head, neck, shoulders, and wrists, and "[saw] stars." *Id.* ¶ 113.  Lieutenant Scagliarni deployed a chemical agent to Plaintiff's face, eyes, and open cut while RN Anglade watched and did not intervene. *Id.* ¶ 114.  Defendants Scagliarni, Konopelski, and Swol then relieved Defendant Ericson, and RN Anglade placed a mesh bag over Plaintiff's face and head, "grinding the chemical agent into his eyes and open laceration." *Id.* ¶ 115.  Plaintiff was sedated and put on a stretcher by Defendants Harvey, Daniele, Swol, Konopelski, Stone, and Vazquez, at least some of whom were "conveniently waiting in the hallway." *Id.*  The sedation was ordered by Dr. Zaidi without Plaintiff's consent. *Id.* ¶ 116.

Plaintiff was transported to UConn while unconscious. *Id.* ¶ 117.  Thus, he was unable to describe to RN Scott-Mailloux his concussion-like symptoms, severe shoulder pain, swollen and injured wrists and hand, blurry vision, and burning eyes. *Id.*  RN Scott-Mailloux further sedated Plaintiff without his consent, *id.*, and Dr. Zaidi and RN Scott-Mailloux sutured Plaintiff's laceration, *id.* ¶ 118.  Because Plaintiff was not conscious, no neurological examination was performed. *Id.*  Plaintiff posits that correctional staff provided RN Scott-Mailloux with false information about how his head trauma occurred, and that this false information could have resulted in him not receiving proper treatment. *Id.* ¶ 119.  Plaintiff now has a visible scar on his left temple. *Id.* ¶ 120.

After spending some time at UConn, Plaintiff was transported to the infirmary at MacDougall and placed on behavioral observation status ("BOS") under the supervision of Does 7, 8, and 9. *Id.* ¶ 121.  Plaintiff claims that Does 7, 8, and 9 underreported his injuries in his

medical records.  *Id.*  RN Asmah and LPN McDonald, who were responsible for performing bilateral wrist checks on Plaintiff, failed to report Plaintiff's visibly swollen and lacerated wrists, his inability to move his left wrist properly, and his swollen and bruised eyes.  *Id.* ¶ 122.  For three days, Plaintiff was denied a shower.  *Id.* ¶ 123.  In addition, he was never decontaminated from the chemical agent that had been applied to him and he continued to suffer burning and damage to his eyes.  *Id.*  Plaintiff repeatedly asked Does 7, 8, and 9 if he could take a shower but Doe 10 ordered that no shower be allowed.  *Id.* ¶ 124.  RNs Asmah and Burns refused to treat Plaintiff's medical needs, which included handcuff injuries, head trauma, dizziness, nausea, severe shoulder pain, burning eyes, and numbness in his hands.  *Id.* ¶ 125.  They also refused to accurately report Plaintiff's injuries in his medical records.  *Id.*

On December 7, 2020, Plaintiff was seen by Dr. Pillai.  *Id.* ¶ 126.  Dr. Pillai failed to properly examine Plaintiff; for example, Dr. Pillai did not order x-rays of Plaintiff's wrists, conduct a neurological examination, or document Plaintiff's medical condition.  *Id.*  At the time, Plaintiff's face was swollen and he had two black eyes.  *Id.* ¶ 127.

On December 8, 2020, RN Burns permitted Plaintiff to shower and wash away dried blood and the chemical agent.  *Id.* ¶ 128.  RN Burns was immediately reprimanded by Doe 10, which caused her to disregard Plaintiff's needs thereafter.  *Id.*  Because the chemical agent remained in Plaintiff's eyes for so long, his vision has been permanently impaired and he now needs glasses.  *Id.* ¶¶ 129–30.  Plaintiff suffers frequent migraine headaches which cause his vision to become blurry and worsen.  *Id.* ¶¶ 130–31.

Between December 6, 2020, and December 31, 2020, Plaintiff told every Defendant with whom he came into contact that his shoulder felt as if it had been reinjured in the incident with

Defendants Scagliarni, Ericson, and Swol.  *Id.* ¶ 132.  Still, he received no treatment for any of the injuries he sustained.  *Id.*  On December 8, 2020, Plaintiff submitted an "informal resolution" to Defendants Barone, Doran, Maldonado, and Ogando, but he did not receive any responses.  *Id.* ¶ 133.  On December 10, 2020, Plaintiff reported his injuries to Defendants Dow and Melendez.  *Id.* ¶ 134.  Dow and Melendez told Plaintiff that if he "signed off" on a disciplinary report, he would receive an eye exam and medical care.  *Id.*  Plaintiff could not see or read the disciplinary report due to his head trauma and the chemical agent that had been applied to him, and he never received the care Dow and Melendez promised.  *Id.*  On December 11, 2020, Plaintiff reported his injuries to Captain Danik, who was responsible for signing off on reports generated by Lieutenant Scagliarni, but Captain Danik did nothing to ensure Plaintiff was treated.  *Id.* ¶ 135.

On or about December 12, 2020, Doe 11 removed Plaintiff's stitches.  *Id.* ¶ 136.  Although Plaintiff described his injuries to Doe 11, Doe 11 refused to examine Plaintiff and said that Plaintiff "deserved what happened."  *Id.*  On December 31, 2020, Plaintiff was seen by RN Hite, who minimized his injuries.  *Id.* ¶ 137.  Eventually, new x-rays were ordered.  *Id.* ¶ 138.  The x-rays showed a greater separation of the A/C joint in Plaintiff's right shoulder and a widening of the scapholunate interval in Plaintiff's left hand.  *Id.*

On December 28, 2020, Plaintiff submitted three grievances complaining of misconduct.  *Id.* ¶ 139.  Two grievances were rejected, and one was compromised with Warden Barone, who authorized an investigation by Defendant Santiago.  *Id.*  Plaintiff appealed all three grievances.  *Id.*  Plaintiff's appeals were answered by District Administrator Rodriguez, who rejected two appeals and denied the third.  *Id.*  Plaintiff contends that, to date, Defendant Santiago has not completed

his investigation.  *Id.* ¶ 140.  On January 27, 2021, Plaintiff began submitting medical grievances but received no responses.  *Id.* ¶ 141.

The injuries to Plaintiff's shoulder caused by the December 6, 2020, incident and subsequent delay in treatment required a second, more invasive surgery.  *Id.* ¶ 142.  Dr. Mazzocca performed the surgery at UConn on March 16, 2021.  *Id.*  Plaintiff has received no meaningful treatment for the injuries to his wrists and left hand.  *Id.* ¶ 143.

### C.  Count Three

On May 8, 2021, while Plaintiff was at Walker recovering from his March 16, 2021, surgery, Defendants Salius, Rule, Santangelo, Jacovino, Doe 12, and Doe 13 came to Plaintiff's cell and told him that he needed to go with them.  *Id.* ¶¶ 150–51.  Plaintiff was handcuffed in front after he requested to be restrained in this manner due to his medical restrictions.  *Id.* ¶ 152.  As the group entered the hallway outside the C-1 and C-2 housing units, Plaintiff asked why he was being placed in restrictive housing.  *Id.* ¶ 153.  After Plaintiff asked this question, Captain Salius ordered Does 12 and 13 to place Plaintiff against the wall, *id.* ¶ 154, and then sprayed a chemical agent directly into Plaintiff's eyes and face from inches away, *id.* ¶ 155.  Does 12 and 13, aided by Santangelo and Jacovino, brought Plaintiff to the ground and one of them choked Plaintiff until he was nearly unconscious.  *Id.* ¶ 156.  They also pulled Plaintiff's arms, causing him severe pain and, Plaintiff believes, reseparating his right shoulder A/C joint.  *Id.*

Plaintiff was placed on a stretcher with a mesh bag over his head and was not properly decontaminated following the application of the chemical agent to his eyes and face.  *Id.* ¶ 157.  He was eventually placed in an ambulance, accompanied by Officer Bennett.  *Id.* ¶ 158.  Although

Plaintiff complained that the chemical agent was burning his eyes, Officer Bennett merely grinned and did not attempt to neutralize the chemical agent. *Id.*

Plaintiff was taken to Saint Francis Hospital, where Officers Bennett, Outar, and Favreau placed him on a stretcher in four-point restraints. *Id.* ¶ 159. The restraints were very tight, further injuring and permanently scarring Plaintiff's wrists and hands. *Id.* ¶ 160. As a result, the numbness in Plaintiff's left hand has nearly doubled and his right hand, which had little numbness before, now has symptoms comparable to his left hand. *Id.* Plaintiff's position on the stretcher also caused greater pain and further injury to his right shoulder. *Id.* ¶ 161. Plaintiff told Officer Bennett that he would file a grievance at his first opportunity. *Id.* ¶ 162. In response, Officer Bennett snapped Plaintiff's right wrist and index finger backward, causing Plaintiff severe pain, placed a mesh bag over Plaintiff's head, and said "have fun trying to write now." *Id.* ¶¶ 163–64. Officers Outar and Favreau did not intervene. *Id.* ¶ 165. Plaintiff reported this incident to RN Laura, the nurse at Saint Francis Hospital responsible for his care, but she did not report the incident or treat Plaintiff. *Id.* ¶ 166. The injury to Plaintiff's wrist was so noticeable that, on May 10, 2021, Dr. Pillai ordered x-rays of Plaintiff's wrists. *Id.* ¶ 167. The x-rays showed soft tissue swelling and widening of the scapholunate interval, which suggested that Plaintiff had suffered a ligament injury. *Id.* ¶ 168. While the x-rays were being taken, Plaintiff tried to tell Doe 14 that his fingers should be included but she ignored him and Doe 16 told Plaintiff to "shut the [expletive] up!" *Id.* ¶ 169. Plaintiff claims that there is reason to believe that the imaging quality of the x-rays was poor or that the x-rays were not done properly. *Id.*

Plaintiff was ultimately sent to restrictive housing and, while he was there, he spoke to Lieutenant Ruiz about staff misconduct. *Id.* ¶ 170. When Plaintiff's time in restrictive housing

was set to expire, Officer Lohmann kept him there for an additional day in retaliation for his reporting staff misconduct to Lieutenant Ruiz. *Id.* ¶ 171. On May 26, 2021, Plaintiff was transferred to Corrigan. *Id.* ¶ 172. Plaintiff asserts that the transfer was intended to disrupt his ability to file grievances about staff misconduct and medical care. *Id.*

On June 1, 2021, Plaintiff wrote to the medical unit and described his ailments. *Id.* ¶ 173. Someone Plaintiff describes only as "Phillps" added Plaintiff to the list to see a provider. *Id.* On June 17, 2021, Plaintiff again wrote to the medical unit because he had not yet been seen or treated, and someone named "Kayla" added him to the sick-call list. *Id.* ¶ 174. Between June 18, 2021, and June 21, 2021, Plaintiff stopped Lieutenants Titus, Dumas, and Bragdon and showed them his injuries. *Id.* ¶ 175. None of these three Defendants obtained medical attention for Plaintiff. *Id.*

On June 27, 2021, Plaintiff again wrote to the medical unit, *id.* ¶ 176, and, on June 30, 2021, he was sent to the medical unit for bloodwork. *Id.* ¶ 177. While he was there, Plaintiff showed an individual named Mary Beth his injuries and she arranged for him to be seen by Dr. Rader. *Id.* Dr. Rader read the x-rays performed on Plaintiff on May 10, 2021, and identified a fracture in Plaintiff's right index finger. *Id.* ¶ 178. Dr. Rader then ordered an individual named "Carley" to "buddy-tap[e]" Plaintiff's finger. *Id.* On July 1, 2021, new x-rays were taken. *Id.* ¶ 179. When the x-rays "revealed no comparison for [Plaintiff's] right finger as previously thought," Dr. Rader changed his fracture diagnosis to swelling, pain, and inability to bend the right finger. *Id.* The x-ray of Plaintiff's right shoulder continued to show a reseparation of the A/C joint. *Id.*

Plaintiff began writing grievances regarding DOC misconduct, but his efforts were blocked by RN Brennan, who rejected, denied, or failed to respond to the grievances. *Id.* ¶ 180. On August 2, 2021, Plaintiff wrote directly to Defendant Quiros but did not receive a response. *Id.* ¶ 181. On

14

August 6, 2021, Dr. Rader understated and misstated Plaintiff's medical conditions and diagnoses. *Id.* ¶ 182.  Plaintiff believes Dr. Rader did so in response to his many grievances about delay and lack of treatment.  *Id.*

### III.    JOINDER

Recognizing that Plaintiff's complaint asserts claims arising from three separate time periods, the Court turns first to the question of whether Plaintiff's claims are properly joined in a single suit.  Upon examination of Plaintiff's complaint, the Court finds that the claims in Counts One, Two, and Three are unrelated.  Accordingly, the Court severs and dismisses without prejudice Counts Two and Three.

Federal Rule of Civil Procedure 20(a)(2) permits joinder of multiple defendants in one action if:  first, "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions and occurrences"; and second, "any question of law or fact common to all defendants will arise in the action."   The Court may "drop a party" or "sever any claim against any party" that it finds to be improperly joined.  Fed. R. Civ. P. 21.  Misjoinder of parties is not a ground for dismissing an action, *id.*, but misjoinder of unrelated claims against multiple defendants is a particular concern in prisoner-initiated cases "because of the applicability of the three strikes and filing fee provisions of the Prison Litigation Reform Act."  *Urbanski v. Dep't of Corr.*, No. 3:18-cv-1323 (VLB), 2019 WL 6683047, at *8 (D. Conn. Dec. 5, 2019).

With respect to the first requirement of Rule 20(a), what constitutes the same "transaction" or "occurrence" is approached on a case-by-case basis.  *Dixon v. Scott Fetzer Co.*, 317 F.R.D. 329, 331 (D. Conn. 2016).  Whether claims arise out of the same transaction depends on the logical

relationship between the claims and whether the "essential facts" of the claims "are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Harris v. Steinem*, 571 F.2d 119, 123 (2d Cir. 1978).[3]   The same transaction requirement "means that there must be some allegation that the joined defendants conspired or acted jointly." *Arista Records LLC v. Does 1-4*, 589 F. Supp. 2d 151, 154 (D. Conn. 2008) (internal quotation marks omitted).   The second requirement—that a question of law or fact common to all defendants will arise in the action—is met where "the court finds that there is 'substantial' overlap in questions of law or fact across the claims." *Ardolf v. Weber*, 332 F.R.D. 467, 479 (S.D.N.Y. 2019).   The mere fact that the same statutes may be at issue in two claims is not enough to render the claims sufficiently related for purposes of joinder; rather, where a plaintiff's claims under the same statutory framework "arise from different circumstances and would require separate analyses," the claims are not logically related.   *Costello v. Home Depot U.S.A., Inc.*, 888 F. Supp. 2d 258, 264 (D. Conn. 2012).

In this case, the Court concludes that the three counts alleged in Plaintiff's complaint are improperly joined together in one suit.   Although all three counts include claims for deliberate indifference to medical needs and the use of excessive force, the claims relate to different time periods, different incidents, and, for the most part, different Defendants.   Count One covers October of 2019 through August of 2020, Count Two covers conduct in December of 2020, and

---

[3] Although *Harris* arose in the context of Rule 13(a), which applies to compulsory counterclaims, "[i]n construing the term 'transaction or occurrence' under Rule 20, many courts have drawn guidance from the use of the same term in Rule 13(a)."  *Barnhart v. Town of Parma*, 252 F.R.D. 156, 160 (W.D.N.Y. 2008) (citation omitted).

Count Three primarily covers the period from May through July of 2021. Of the sixty-two Defendants, only Dr. Pillai is mentioned in more than one count, and Plaintiff alleges no facts suggesting that the defendants named in one count acted jointly with the defendants named in another count. Although the general claims in all three counts are similar, analysis of each count will involve consideration of different facts and different Defendants. Thus, the counts are not logically related. For these reasons, judicial economy and fairness do not dictate that the claims be resolved in one lawsuit.

Accordingly, the claims in Counts Two and Three are severed from this case and dismissed without prejudice. While the claims in Counts Two and Three against Defendants Santiago, Barone, Harvey, Daniele, Swol, Konopelski, Stone, Vazquez, Zaidi, Ericson, Doe 7, Doe 8, Doe 9, Doe 10, Hite, Anglade, Bauza, Scott-Mailloux, Asmah, McDonald, Pillai, Doe 11, Dow, Melendez, Danik, Doran, Maldonado, Ogando, Burns, Scagliarni, Rodriguez, Quiros, Brennan, Salius, Rule, Santangelo, Jacovino, Doe 12, Doe 13, Bennett, Outar, Favreau, Laura, Doe 14, Lohmann, Rader, Titus, Dumas, and Bragdon are not properly brought in this action, Plaintiff may pursue them in separate lawsuits. The Court notes, however, that because the claims in Counts Two and Three are not related to each other, they must be brought in two separate suits.[4]

Having severed and dismissed Counts Two and Three from this action, the Court will proceed with initial review of Plaintiff's claims in Count One.

_____

[4] The Court advises Plaintiff that section 1983 claims are generally subject to the three-year statute of limitations in Connecticut General Statutes § 52-577. *See Lounsbury v. Jeffries*, 25 F.3d 131, 134 (2d Cir. 1994); *but see Rodrigues v. J.P. Morgan Chase Bank*, No. 3:08-CV-1417 (PCD), 2009 WL 3710688, at *6 (D. Conn. Nov. 3, 2009) (citing *Inovejas v. Dufault*, No. CV 880496171S, 2000 WL 327784 (Conn. Super. Ct. Mar. 13, 2000), and discussing how Connecticut's Accidental Failure of Suit statute, Conn. Gen. Stat. § 52-592, may extend the statute of limitations period for claims that were previously dismissed due to improper joinder).

## IV.   INITIAL REVIEW OF CLAIMS IN COUNT ONE

In Count One, Plaintiff asserts various claims seeking monetary damages from Defendants Hill, Marceau, Studalnik, Reynoso, Lee, Graham, Naqvi, and Does 1 through 6 in their individual and official capacities.  First, Plaintiff alleges that Officer Reynoso's "gratuitous and excessive use of force" violated his rights under the Fourth Amendment of the U.S. Constitution and Article First, Section 7 of the Connecticut Constitution.  Second, Plaintiff alleges that Lieutenant Studalnik failed to intervene on his behalf while Officer Reynoso used excessive force against him.  Third, Plaintiff alleges that several Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.  Fourth, the Court construes Plaintiff's complaint as attempting to assert a First Amendment retaliation claim with respect to Officer Reynoso's purported threats and harassment and Plaintiff's purported "retaliatory" transfer to Walker.  Fifth, Plaintiff asserts a state law tort claim for negligent infliction of emotional distress.  Finally, the Court construes Plaintiff's complaint as attempting to state a claim for intentional infliction of emotional distress.

As a preliminary matter, although Plaintiff seeks monetary damages from Defendants in both their individual and official capacities, "absent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court," *Kentucky v. Graham*, 473 U.S. 159, 169 (1985).  This bar applies where state officials are sued for damages in their official capacities because "a judgment against a public servant in his official capacity imposes liability on the entity that he represents."  *Id.* (internal quotation marks omitted).  Therefore, "[a]bsent a waiver of Eleventh Amendment immunity, the Eleventh Amendment bars claims for damages brought against state employees sued in their official capacities when the state

18

is the real party in interest." *Mulero v. Blumenthal*, No. 3:10-CV-1328 (WWE), 2011 WL 1194401, at *1 (D. Conn. Mar. 28, 2011) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984)).  Congress has not abrogated the states' immunity from suit under section 1983; nor has Connecticut waived its sovereign immunity under this statute.  *Wagner v. Conn. Dep't of Corr.*, 599 F. Supp. 2d 229, 238 (D. Conn. 2009).  Thus, to the extent Plaintiff seeks damages from Defendants in their official capacities, his claims in Count One are dismissed as barred by the Eleventh Amendment.

The Court will address each of Plaintiff's claims in Count One to the extent they seek damages from Defendants in their individual capacities only.

A.  Excessive Force and Failure to Intervene

As described above, Plaintiff has alleged that Officer Reynoso used excessive force against him by slamming him against a wall and pulling his injured arm behind his back, and that Lieutenant Studalnik failed to intervene despite Plaintiff's complaints that he was experiencing severe pain.  Compl. ¶¶ 73–74.  Upon review of Plaintiff's allegations, the Court will allow these claims to proceed past initial review for further development of the record.

At the outset, while Plaintiff characterizes his excessive force claim as alleging a Fourth Amendment violation, records available on the DOC website show that Plaintiff is unsentenced and was therefore a pretrial detainee when the events giving rise to his excessive force claim

allegedly took place.[5]  Accordingly, because this claim arises in the post-arraignment, pre-sentence

context, it implicates Plaintiff's Fourteenth Amendment rights rather than his Fourth Amendment

rights.  *See Ali v. Szabo*, 81 F. Supp. 2d 447, 454 (S.D.N.Y. 2000) ("Because [the plaintiff's

excessive force] claim arose while he was a post-arraignment, pre-conviction pretrial detainee, and

since neither the Eighth nor the Fourth Amendment covers his claim, it is properly analyzed under

the Fourteenth Amendment substantive due process standard."); *see also Bell v. Wolfish*, 441 U.S.

520, 535 n.16 (1979) (noting that a claim asserted by a pretrial detainee is reviewed under the

Fourteenth Amendment Due Process Clause).  Given the special solicitude with which the Court

must review *pro se* submissions, however, the Court will consider Plaintiff's Fourth Amendment

claim in Count One as brought under the Fourteenth Amendment.

The Due Process Clause of the Fourteenth Amendment "protects a pretrial detainee from

the use of excessive force that amounts to punishment."  *Frost v. N.Y.C. Police Dep't*, 980 F.3d

231, 251–52 (2d Cir. 2020) (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)).  A pretrial

detainee can show that an officer's actions constitute punishment if the actions were "taken with

an expressed intent to punish" or if "the actions are not rationally related to a legitimate

nonpunitive governmental purpose" or "appear excessive in relation to that purpose."  *Id.* (internal

quotation marks omitted) (quoting *Bell*, 441 U.S. at 538, and *Kingsley v. Hendrickson*, 576 U.S.

389, 398 (2015)).  When determining whether an officer's use of force was objectively reasonable,

---

[5]  *See Inmate Information*, Conn. State Dep't of Corr., http://www.ctinmateinfo.state.ct.us/
detailsupv.asp?id_inmt_num=330363 (last visited Jan. 5, 2023).  The Court may "take judicial notice of relevant
matters of public record."  *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012); *see Goss v. City of New London*, No.
3:20-CV-01507 (SALM), 2022 WL 375462, at *1 n.1 (D. Conn. Feb. 8, 2022) (taking judicial notice of the date the
plaintiff was sentenced according to the State of Connecticut DOC Inmate Information website).

the Court considers the facts and circumstances of the particular case "from the perspective of a reasonable officer on the scene." *Kingsley*, 576 U.S. at 397.  The Court considers factors including, but not limited to, "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.*

In addition, prison officials can be held liable under section 1983 "for failing to intervene in a situation where another official is violating an inmate's constitutional rights, including the use of excessive force, in their presence." *Abreu v. Bascue*, No. 9:18-CV-0186 (MAD/ATB), 2018 WL 11466956, at *13 (N.D.N.Y. May 1, 2018).  Liability for failure to intervene "can arise where a prison corrections officer fails to prevent another corrections officer from committing a constitutional violation if (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Delano v. Rendle*, No. 9:13-CV-00070 (NAM/TWD), 2016 WL 4146476, at *11 (N.D.N.Y. July 12, 2016), *report and recommendation adopted*, No. 9:13-CV-70 (NAM/TWD), 2016 WL 4133542 (N.D.N.Y. Aug. 3, 2016) (internal quotation marks omitted).

With respect to his excessive force claim, Plaintiff alleges that Officer Reynoso, seemingly without justification, slammed him into the wall and yanked his arms up behind his back, causing him severe pain in light of his shoulder injury.  Compl. ¶¶ 73–74.  Plaintiff's allegations, when taken as true and liberally construed, suggest that Officer Reynoso used such force without any nonpunitive governmental purpose, or in excess of any such purpose, and without reasonably

perceiving any threat from Plaintiff.  Thus, for purposes of initial review, Plaintiff's allegations that Officer Reynoso used this force without justification—while disregarding Plaintiff's complaints that he had a shoulder injury and that he was experiencing severe pain—are sufficient to allow his excessive force claim to proceed for further development of the record.

With respect to his failure to intervene claim, Plaintiff alleges that Lieutenant Studalnik escorted him from his cell to the sallyport and then, despite Plaintiff's complaints that he was experiencing severe pain due to his shoulder injury, did nothing to help Plaintiff as Officer Reynoso used excessive force against him.  Compl. ¶¶ 73–74.  For purposes of initial review, these allegations suffice to suggest that Lieutenant Studalnik had a realistic opportunity to intervene and prevent harm to Plaintiff, that a reasonable person in Lieutenant Studalnik's position would know that Plaintiff's constitutional rights were being violated, and that Lieutenant Studalnik did not take reasonable steps to intervene.  Accordingly, Plaintiff's failure to intervene claim against Lieutenant Studalnik will proceed for further development of the record.

B.  <u>Deliberate Indifference to Serious Medical Needs</u>

Construed liberally, Plaintiff's complaint alleges that Defendants Hill, Marceau, Lee, Graham, Naqvi, and Does 1 through 6 exhibited deliberate indifference to his serious medical needs by disregarding his shoulder injuries and failing to provide him with adequate care or treatment.  *See* Compl. ¶¶ 64–95.  For the reasons below, the Court will allow Plaintiff's claims against Defendants Hill, Lee, Graham, Naqvi, Doe 1, and Does 3 through 6, as well as his claim that Defendant Marceau failed to refer him to a doctor, to proceed past initial review for further development of the record.  The Court, however, dismisses Plaintiff's claim against Doe 2 and his claim that Defendant Marceau failed to prescribe him a strong enough pain reliever.

22

As a preliminary matter, although Plaintiff brings his deliberate indifference claims under the Eighth Amendment, the Due Process Clause of the Fourteenth Amendment governs claims of deliberate indifference brought by pretrial detainees. *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017); *Haslinger v. Westchester Cnty.*, No. 7:18-CV-05619 (PMH), 2020 WL 2061540, at *7 (S.D.N.Y. Apr. 29, 2020).  This is because pretrial detainees "have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." *Darnell*, 849 F.3d at 29 (internal quotation marks omitted).  Although Plaintiff has incorrectly pleaded his deliberate indifference claims under the Eighth Amendment, the Court—affording the required special solicitude to Plaintiff's *pro se* submissions—will consider Plaintiff's deliberate indifference claims as brought under the Fourteenth Amendment.

A pretrial detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Id.* (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).  A claim that a prison official has acted with deliberate indifference under the Fourteenth Amendment involves analysis of two prongs:  (1) an objective prong, which requires a plaintiff to show that "the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process"; and (2) a subjective or "*mens rea*" prong, which requires a plaintiff to show that the defendant "acted with at least deliberate indifference to the challenged conditions." *Id.*

With respect to the first prong of a deliberate indifference claim, the plaintiff must show that the conditions he experienced "either alone or in combination, pose[d] an unreasonable risk of serious damage to his health." *Id.* at 30.  The objective prong is satisfied "when (a) the prisoner was actually deprived of adequate medical care, meaning prison officials acted unreasonably in

response to an inmate health risk under the circumstances, and (b) the inadequacy in medical care is sufficiently serious." *Bellotto v. Cnty. of Orange*, 248 F. App'x 232, 236 (2d Cir. 2007) (amended summary order).[6]  "If the unreasonable care consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is sufficiently serious." *White v. Williams*, No. 9:12-CV-1892, 2016 WL 1237712, at *9 (N.D.N.Y. Jan. 11, 2016), *report and recommendation adopted*, No. 9:12-CV-1892 (GLS/ATB), 2016 WL 1239263 (N.D.N.Y. Mar. 29, 2016) (internal quotation marks omitted) (citing *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003)).

A "sufficiently serious" deprivation of a plaintiff's right to due process can exist if the plaintiff suffers from an urgent medical condition that can cause death, degeneration, or extreme or chronic pain. *See Brock v. Wright*, 315 F.3d 158, 162–63 (2d Cir. 2003); *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  A degenerative medical condition that does not initially appear serious may, in fact, be serious if it will "result in further significant injury or the unnecessary and wanton infliction of pain" when left untreated or neglected for a long period of time.  *Harrison v. Barkley*, 219 F.3d 132, 136–37 (2d Cir. 2003).  The Second Circuit has identified several factors that are "highly relevant" to the question of whether a medical condition is sufficiently serious, including the existence of "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an

---

[6] Although *Bellotto* arises in the Eighth Amendment context, the Second Circuit has "often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment."  *See Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000).

individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702–03 (2d Cir. 1998).

Although courts have discussed the second prong of a Fourteenth Amendment deliberate indifference claim as a "subjective" requirement, the Second Circuit has held that it "can be established by either a subjective or objective standard." *Charles v. Orange Cnty.*, 925 F.3d 73, 87 (2d Cir. 2019) (citing *Darnell*, 849 F.3d at 35). Under this formulation of the second prong, the Due Process Clause "can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." *Darnell*, 849 F.3d at 35. In order to prove deliberate indifference for purposes of a Fourteenth Amendment violation, however, the plaintiff must show that the defendant "acted intentionally to impose the alleged condition," or "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* An official's negligence is not enough; the detainee "must prove that an official acted intentionally or recklessly, and not merely negligently." *Id.* at 36. Notably, courts have found reckless conduct where the plaintiff did not receive treatment for a documented injury. *See King v. Falco*, No. 16-CV-6315 (VB), 2018 WL 6510809, at *9 (S.D.N.Y. Dec. 11, 2018).

In assessing Plaintiff's deliberate indifference claims, the Court begins by finding that, for purposes of initial review, Plaintiff's allegations adequately suggest that his shoulder injuries—to the extent they were left untreated—posed an unreasonable risk of serious damage to his health and therefore could constitute an objective deprivation of his right to due process. As noted, a sufficiently serious deprivation of a plaintiff's due process rights can occur if the plaintiff suffers

from an urgent medical condition capable of causing "extreme or chronic pain." *See Brock*, 315 F.3d at 162–63; *Hathaway*, 99 F.3d at 553. Here, Plaintiff alleges that he suffered from severe and constant shoulder pain due to injuries including the separation of his A/C joint, a labrum tear, and additional injuries he suffered as a result of the force used against him while he was a pretrial detainee. Notably, Plaintiff alleges that he anticipated being scheduled for surgery prior to his admission to the DOC and underwent surgery while incarcerated. *See* Compl. ¶¶ 67–68, 95. For purposes of initial review, these allegations adequately suggest that Plaintiff's untreated shoulder injuries posed an unreasonable risk of serious damage to his health.

The Court will next address whether Plaintiff has otherwise adequately pleaded deliberate indifference claims against Defendants Doe 1, Hill, Doe 2, Marceau, Lee, Doe 3, Graham, Does 4, 5, and 6, and Naqvi.

### 1.  *RN Doe 1*

Plaintiff alleges that RN Doe 1 assessed him upon his admission to the DOC and that— although he told Doe 1 that he was being treated for a shoulder separation and labrum tear, that he had been advised he needed surgery, and that his injuries caused him severe and constant pain— Doe 1 did not refer him to a doctor or provide any pain management. Compl. ¶¶ 65–67. Plaintiff further alleges that "even a lay person" could have noticed his injury. *Id.* ¶ 67. For purposes of initial review, Plaintiff's allegations adequately suggest that, by failing to refer him for medical treatment or provide him with pain management, Doe 1 recklessly failed to act with reasonable care to mitigate the risk Plaintiff's shoulder injuries posed to him. Accordingly, the Court will allow Plaintiff's deliberate indifference claim against Doe 1 to proceed for further development of the record.

### 2. RN Hill

Plaintiff alleges that he saw RN Hill at sick call a few days after his admission to the DOC and that she neither performed a proper examination on his shoulder nor provided him with any pain management.  Compl. ¶ 69.  Plaintiff further contends that, although RN Hill told him that she would arrange for him to see a doctor, she did not do so.  *Id.* ¶ 70.  For purposes of initial review, Plaintiff's allegations adequately suggest that, by failing to perform a proper examination, treat Plaintiff, or refer Plaintiff to a doctor, RN Hill recklessly failed to act with reasonable care to mitigate the risk Plaintiff's shoulder injuries posed to him.  Accordingly, the Court will permit Plaintiff's claim against RN Hill to proceed for further development of the record.

### 3. Doe 2

Plaintiff alleges that, on October 31, 2019, in response to his requests to see a doctor for his pain, nurse Doe 2 put him on the sick-call list instead of the list that would permit him to see a doctor.  Compl. ¶¶ 9, 71.  Plaintiff offers no allegations, however, to support the proposition that Doe 2's decision to refer him to sick call, rather than immediately to a doctor, constitutes anything more than negligence on the part of Doe 2.  Indeed, Plaintiff alleges that Doe 2 *did* refer him for further assessment of his medical needs, but simply did not refer him to a doctor, as he would have preferred.  Allegations of a mere disagreement over appropriate treatment generally do not suffice to state a claim for deliberate indifference.  *See Wright v. Rao*, 622 F. App'x 46, 47 (2d Cir. 2015) (summary order) (citing *Chance*, 143 F.3d at 703); *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) ("It has long been the rule that a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment.").  Rather, "the essential test is one of medical necessity and not one simply of desirability."  *Hill*, 657 F.3d at 123 (internal quotation marks

omitted). Here, Plaintiff's allegations that Doe 2 referred him to sick call, rather than immediately to a doctor, do not plausibly allege that Doe 2 acted with deliberate indifference to Plaintiff's medical needs and, as a result, Plaintiff's deliberate indifference claim against Doe 2 is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

### 4. *RN Marceau*

Plaintiff alleges that RN Marceau was deliberately indifferent to his serious medical needs in two respects. First, Plaintiff asserts that, when RN Marceau saw him at sick call on November 6, 2019, she gave him low dose Motrin for his pain instead of a stronger prescription, which Plaintiff would have preferred. Compl. ¶ 72. Second, Plaintiff asserts that RN Marceau said that she would arrange for him to see a doctor but did not do so. *Id.* The Court will address each claim in turn.

At the outset, Plaintiff's claim that RN Marceau failed to provide him with a pain reliever stronger than low dose Motrin appears to be a mere disagreement over treatment that does not rise to the level of a cognizable Fourteenth Amendment violation. *See Wright*, 622 F. App'x at 47 (citing *Chance*, 143 F.3d at 703); *Hill*, 657 F.3d at 123 ("It has long been the rule that a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment."). Here, although Plaintiff may have preferred a pain reliever stronger than low dose Motrin, he does not allege that it was medically necessary for him to receive such a pain reliever. Therefore, Plaintiff's first claim against RN Marceau is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

By contrast, for purposes of initial review, Plaintiff's allegations adequately suggest that, by failing to arrange for him to see a doctor after telling him at sick call that she would do so, RN

Marceau recklessly failed to act with reasonable care to mitigate the risk Plaintiff's shoulder injuries posed to him. Therefore, the Court will allow this portion of Plaintiff's claim against RN Marceau to proceed for further development of the record.

### 5. APRN Lee

Plaintiff alleges that APRN Lee assessed his injuries following Officer Reynoso's use of force in the sallyport, but did not properly examine him or provide any treatment even though Plaintiff stated that Officer Reynoso had injured him and that the restraints used on him caused him discomfort. Compl. ¶¶ 75–77. Plaintiff further alleges that x-rays taken two days later showed a grade 4 A/C joint separation, but APRN Lee provided no treatment despite Plaintiff's explanation of his condition and the injury inflicted by Office Reynoso. *Id.* ¶ 79. The Court finds that, for purposes of initial review, Plaintiff has sufficiently alleged that APRN Lee recklessly disregarded his serious medical needs by failing to examine him or provide any treatment, despite his statements to her that he had been seriously injured. Therefore, Plaintiff's deliberate indifference claim against APRN Lee will proceed for further development of the record.

### 6. Doe 3

Plaintiff alleges that, after he was transferred to Walker, he reported constant pain and asked to see a doctor and receive an MRI, but Doe 3 did nothing in response to his requests and complaints. Compl. ¶¶ 80–82. The Court finds that, for purposes of initial review, these allegations are sufficient to suggest that Doe 3 acted recklessly by failing to respond to Plaintiff's complaints of constant pain and requests for treatment. Thus, the Court will permit Plaintiff's claim against Doe 3 to proceed for further development of the record.

### 7.  RN Graham

Plaintiff alleges that, when RN Graham saw him on February 11, 2020, she denied him a bottom bunk pass, provided no treatment or pain management, and merely told him to limit use of his dominant arm.  Compl. ¶¶ 86–87.  Although disagreements regarding choice of treatment are generally not actionable, judgments that have "no sound medical basis, contravene professional norms, and appear designed simply to justify an easier course of treatment" or no treatment at all, may provide the basis for a claim.  *Stevens v. Goord*, 535 F. Supp. 2d 373, 388 (S.D.N.Y. 2008). Here, Plaintiff alleges that RN Graham provided no treatment or pain management and that she only told him to limit use of his dominant arm.  Thus, for purposes of initial review, the Court finds that Plaintiff's allegations adequately suggest that RN Graham acted with deliberate indifference to his serious medical needs.  Accordingly, the Court will permit Plaintiff's claim against RN Graham to proceed for further development of the record.

### 8.  Does 4, 5, 6

Plaintiff alleges that Does 4, 5, and 6 were deliberately indifferent to his serious medical needs by failing to arrange for him to be seen by an orthopedist and by failing to arrange for him to receive the physical therapy he was prescribed.  Compl. ¶¶ 90–92, 99.  The Court will examine each of these claims in turn.

With respect to his first claim against Does 4, 5, and 6, Plaintiff alleges that these Defendants were responsible for scheduling his appointments and arranging his transportation but failed to arrange for him to receive an orthopedic consult despite an order that he was to receive such care.  *Id.* ¶ 90.  The Court construes these allegations as asserting that inaction on the part of Does 4, 5, and 6 delayed Plaintiff's orthopedic consult until he was "finally seen" by Dr. Mazzocca

on June 12, 2020, *see id.* ¶¶ 90–92.  As a preliminary matter, the Court acknowledges that Plaintiff alleges that he *did* eventually receive an orthopedic consult, presumably arranged by Does 4, 5, and 6.  Thus, the Court must first examine whether the purported delay in arranging for such care constituted a sufficiently serious deprivation of Plaintiff's rights to satisfy the first prong of his deliberate indifference claim.

In the Eighth Amendment context, the Second Circuit has held that, where a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is in 'objective terms, sufficiently serious.'"  *Smith*, 316 F.3d at 185 (emphasis in original) (quoting *Chance*, 143 F.3d at 702).[7]  Plaintiff alleges that his shoulder condition caused him constant severe pain, and that the purported failure of Does 4, 5, and 6 to arrange for his orthopedic consult caused him to experience this pain for what may have been several weeks or months.  Although Plaintiff does not provide facts indicating the precise length of this delay, for purposes of initial review, the Court will liberally construe his allegations as suggesting that the delay was long enough to constitute a sufficiently serious deprivation of his rights.  For purposes of initial review, Plaintiff's allegations are also sufficient to suggest that, by delaying several weeks or months despite the order that Plaintiff was to receive an orthopedic consult, Does 4, 5, and 6 recklessly failed to act with reasonable care to mitigate the serious risk that Plaintiff's shoulder injuries posed to him.

---

[7] As noted, a pretrial detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner."  *Darnell*, 849 F.3d at 29.

Accordingly, the Court will allow Plaintiff's first deliberate indifference claim against Does 4, 5, and 6 to proceed for further development of the record.

With respect to his second claim against Does 4, 5, and 6, Plaintiff alleges that he attended only two physical therapy appointments because these Defendants refused to schedule more sessions. Compl. ¶ 99. As another court in this Circuit has found, the failure to provide prescribed physical therapy may support a prisoner's deliberate indifference claim. *See Stevens*, 535 F. Supp. 2d at 386 ("Defendants' chronic failure to provide Plaintiff with the level of physical therapy treatment that had been prescribed and repeatedly recognized as necessary by treating physicians does provide support for Plaintiff's claim of deliberate indifference to serious medical needs."). Here, Plaintiff alleges that he was supposed to attend biweekly physical therapy appointments, but Does 4, 5, and 6 arranged for him to attend only two appointments total. For purposes of initial review, these allegations adequately suggest that Plaintiff suffered a sufficiently serious deprivation of his rights. Moreover, for purposes of initial review, Plaintiff's allegations are sufficient to suggest that, by disregarding his prescribed physical therapy, Does 4, 5, and 6 recklessly failed to act with reasonable care to mitigate the serious risk that Plaintiff's shoulder injuries posed to him. Accordingly, the Court will permit Plaintiff's second deliberate indifference claim against Does 4, 5, and 6 to proceed for further development of the record.

### 9. Dr. Naqvi

Plaintiff asserts that Dr. Naqvi was deliberately indifferent to his serious medical needs in two ways: first, Plaintiff claims that Dr. Naqvi refused to provide him with adequate treatment for several months; and second, Plaintiff claims that Dr. Naqvi discharged him from the infirmary too soon after his July 28, 2020, surgery. The Court will address each claim in turn.

With respect to his first claim against Dr. Naqvi, Plaintiff alleges the following facts.  First, when Plaintiff was seen by Dr. Naqvi on January 15, 2020, Dr. Naqvi ordered new x-rays instead of basing his treatment decision on the x-rays taken on November 14, 2019.  Compl. ¶ 84.  Then, even though the new x-rays confirmed Plaintiff's injuries, Dr. Naqvi did not provide him with any meaningful treatment.  *Id.* ¶ 85.  Later, when Plaintiff was seen by Dr. Naqvi on March 9, 2020, Dr. Naqvi refused to provide Plaintiff with treatment or pain management, despite Plaintiff's repeated complaints of severe pain.  *Id.* ¶ 88.  Instead, Dr. Naqvi simply told him to "limit use" of his dominant arm but refused to issue him a bottom bunk pass until May 29, 2020.  *Id.* ¶¶ 88–89.  Finally, in June of 2020, Dr. Naqvi continued to refuse to provide Plaintiff with meaningful care, stating that he was waiting for an orthopedic consult from Does 4, 5, and 6.  *Id.* ¶ 91.

While Plaintiff did eventually have surgery on his injured shoulder, Dr. Naqvi's purported delay in providing treatment could suffice to show that he was deliberately indifferent to Plaintiff's medical needs.  *See Smith*, 316 F.3d at 185.  Moreover, the allegation that Dr. Naqvi was awaiting an orthopedic consult does not necessarily defeat Plaintiff's deliberate indifference claim.  *Cf. Lloyd v. Lee*, 570 F. Supp. 2d 556, 561 (S.D.N.Y. 2008) (finding that prisoner had plausibly stated a deliberate indifference claim against his doctor where the doctor requested an MRI but failed to follow up on the request and the MRI did not occur for nine months).  Thus, for purposes of initial review, Plaintiff's allegations that Dr. Naqvi failed to provide treatment for several months adequately suggest that Plaintiff suffered a sufficiently serious deprivation of his right to due process.  In addition, for purposes of initial review, the complaint adequately suggests that, by delaying treatment *despite* Plaintiff's repeated complaints of severe pain, Dr. Naqvi recklessly failed to act with reasonable care to mitigate the serious risk that Plaintiff's shoulder injuries posed

33

to him.  Accordingly, the Court will allow Plaintiff's first deliberate indifference claim against Dr. Naqvi to proceed past initial review.

In his second claim against Dr. Naqvi, Plaintiff alleges that Dr. Naqvi improperly discharged him from the infirmary two weeks after he underwent surgery to repair the labrum in his right shoulder.  Compl. ¶¶ 96, 98.  Plaintiff claims that, because he had been instructed to keep his dominant arm in a sling for six weeks after his surgery, his discharge from the infirmary after only two weeks left him without assistance to perform daily tasks and placed him at greater risk of harm from correctional staff and other prisoners.  *Id.* ¶ 98.  Because Plaintiff's allegations adequately suggest that his post-surgery condition presented a sufficiently serious risk of harm to him if he was placed in the general prison population—and that Dr. Naqvi nonetheless placed him back in the general prison population with knowledge of this substantial risk to his health—the Court will allow Plaintiff's second deliberate indifference claim against Dr. Naqvi to proceed for further development of the record.

## C.  First Amendment Retaliation

Plaintiff alleges that, on November 28, 2019, Officer Reynoso threatened and harassed him "because an incident report was generated by Hill because of Reynoso's malicious actions," Compl. ¶ 80, and that, on November 30, 2019, Plaintiff was transferred to Walker "for retaliatory reasons," *id.* ¶ 81.  The Court construes these allegations as attempting to state a claim for retaliation under the First Amendment to the U.S. Constitution.

To prevail on a First Amendment retaliation claim, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse

action." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019).  Protected speech or activity includes, for example, "filing a lawsuit, an administrative complaint, or a prison grievance."  *Stewart v. Ayala*, No. 3:20-CV-1938 (CSH), 2022 WL 4356467, at *8 (D. Conn. Sept. 20, 2022).  "Although not all oral speech by an inmate constitutes protected activity, some courts within the Second Circuit have determined that verbal or oral complaints about the conduct of prison officials or conditions of confinement may constitute protected speech in the context of a First Amendment retaliation claim."  *Id.*

Here, Plaintiff has failed to allege that he engaged in protected speech or conduct that can be linked to any alleged retaliatory acts by Defendants.  While Plaintiff alleges that Officer Reynoso threatened and harassed him because RN Hill generated an incident report regarding the November 12, 2019, incident in the sallyport, Plaintiff does not allege that he made any written or oral complaints to RN Hill that precipitated Officer Reynoso's purported retaliation.[8]  Moreover, while Plaintiff alleges that he was transferred for retaliatory reasons, he does not allege what these retaliatory reasons were.  Accordingly, to the extent Plaintiff's complaint attempts to assert a First Amendment retaliation claim, that claim is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

---

[8] The Court acknowledges Plaintiff's allegation that, even though he "clearly stated Reynoso had injured him and displayed great discomfort due to the restraints," APRN Lee "failed and refused to examine [Plaintiff's] shoulder or provide any form of treatment."  Compl. ¶ 77.  Plaintiff does not allege, however, that his statement regarding Officer Reynoso's use of force was related to any purported retaliation he experienced.  Instead, he alleges that Officer Reynoso harassed and threatened him because *RN Hill* generated an incident report, not because he complained to APRN Lee about Officer Reynoso.

D.  State Constitutional Claim

Plaintiff contends that the excessive force used by Officer Reynoso violated his rights under Article First, Section 7 of the Connecticut Constitution.  The Court declines to exercise supplemental jurisdiction over this claim.

With certain exceptions, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  "Claims are part of the same case or controversy if they derive from a common nucleus of operative fact[s]."  *Kaplan v. Cnty. of Orange*, 528 F. Supp. 3d 141, 160 (S.D.N.Y. 2021) (alteration in original).  A district court may, however, decline to exercise supplemental jurisdiction over a claim which, for example, "raises a novel or complex issue of State law."  28 U.S.C. § 1367(c)(1).

Although the Connecticut Supreme Court has created a cause of action under Article First, Section 7 for a *Bivens*-type claim, *see Binette v. Sabo*, 710 A.2d 688, 700–01 (Conn. 1998), it has not applied Section 7 to a case filed by an inmate or detainee regarding use of excessive force by correctional staff or prison conditions of confinement.  This is therefore a novel and undeveloped issue of state law, and the Court finds that economy, convenience, fairness, and comity will be served by deferring to the State of Connecticut as the final arbiter of its own constitution, *see Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 85 (2d Cir. 2018).  Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiff's excessive force claim under Article First, Section 7 of the Connecticut Constitution.  *See Baltas v. Dones*, No. 3:22-cv-38 (MPS), 2022 WL 1239989, at *20 (D. Conn. Apr. 27, 2022) (declining to exercise supplemental jurisdiction

36

over claims under Article First, Sections 7 and 9 of the Connecticut Constitution); *Lopez v. Smiley*, 375 F. Supp. 2d 19, 23–26 (D. Conn. 2005) (declining to recognize private right of action under various provisions of the Connecticut Constitution, including Article First, Sections 4, 5, 7, 8, 9, 10, and 14, and deferring to state courts to determine whether to recognize such causes of action in the first instance).

For these reasons, Plaintiff's state constitutional claim is dismissed.

### E.  State Law Tort Claims

Plaintiff asserts state law tort claims alleging intentional and negligent infliction of emotional distress.  The Court interprets Plaintiff's complaint as alleging these claims against all Defendants named in Count One.

At the outset, the Court finds that, to the extent Plaintiff's federal claims survive this order, his state law tort claims derive from the same nucleus of operative facts as those claims and, therefore, form part of the same case or controversy.  *See* 28 U.S.C. § 1367(a); *Kaplan*, 528 F. Supp. 3d at 160.  Construing Plaintiff's complaint liberally, these claims appear to arise generally from Defendants' purported failure to provide him with adequate medical care, Officer Reynoso's purported use of excessive force against him, Lieutenant Studalnik's purported failure to intervene when Officer Reynoso used such force, and the purported retaliatory conduct Plaintiff experienced. Accordingly, because federal claims against Defendants Reynoso, Studalnik, Hill, Marceau, Lee, Graham, Naqvi, Doe 1, and Does 3 through 6 will survive this order, the Court will exercise supplemental jurisdiction over Plaintiff's state law tort claims against these Defendants.

Although the Court has dismissed Plaintiff's only federal claim against Doe 2, it will nonetheless exercise supplemental jurisdiction over Plaintiff's state law tort claims against Doe 2.

Pursuant to section 1367(c)(3), the Court *may* decline to exercise supplemental jurisdiction over a claim if it "has dismissed all claims over which it has original jurisdiction." The Court should not, however, "decline to exercise supplemental jurisdiction unless it also determines that doing so would not promote . . . economy, convenience, fairness, and comity." *Catzin*, 899 F.3d at 85 (quoting *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004)). Declining supplemental jurisdiction "must actually promote those values" because the fact that the Court has dismissed all claims over which it has original jurisdiction "does not mean that dismissal is mandated." *Id.* Here, declining supplemental jurisdiction over Plaintiff's state law tort claims against Doe 2 would not promote economy or convenience, given that the Court is addressing the same claims to the extent they are asserted against several other named and unnamed defendants. Nor are there any compelling reasons why fairness or comity would be served by declining to exercise supplemental jurisdiction over such state law tort claims that the Court routinely handles. Accordingly, the Court will exercise supplemental jurisdiction over Plaintiff's state law tort claims against Doe 2.

Turning to the sufficiency of Plaintiff's state tort law claims, the Court finds that Plaintiff has failed to state claims for either intentional or negligent infliction of emotional distress against any Defendants. A plaintiff claiming intentional infliction of emotional distress must establish four elements: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Bd. of Educ.*, 757 A.2d 1059, 1062 (Conn. 2000) (internal citations and quotation marks omitted). Similarly, a

plaintiff alleging negligent infliction of emotional distress must establish that "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Carrol v. Allstate Ins. Co.*, 815 A.2d 119, 127 (Conn. 2003).

Here, Plaintiff has failed to state claims for negligent or intentional infliction of emotional distress because his allegations with respect to these claims are entirely conclusory. Plaintiff alleges only that "as a direct and proximate cause of [Defendants'] action, or lack thereof," he was "left to suffer extreme, daily, emotional distress and mental anguish believing he was more vulnerable." Compl. ¶ 102. Plaintiff has failed to provide, for example, any specificity regarding the severity of his emotional distress. Such conclusory allegations are insufficient to state a claim. *See Abbott v. Conn. Specialty Servs., Inc.*, No. FBT-CV21-6106020-S, 2022 WL 1449145, at *2 (Conn. Super. Ct. May 9, 2022) (striking claims for intentional and negligent infliction of emotional distress where plaintiff failed to provide more than conclusory allegations of the elements of such claims); *Huff v. West Haven Bd. of Educ.*, 10 F. Supp. 2d 117, 122 (D. Conn. 1998) ("Mere conclusory allegations are insufficient as a matter of law to support a cause of action for intentional infliction of emotional distress.").

Accordingly, Plaintiff's claims for intentional and negligent infliction of emotional distress are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

## ORDERS

For the foregoing reasons, the Court enters the following orders:

The claims in Counts Two and Three are severed and **DISMISSED** without prejudice pursuant to Federal Rules of Civil Procedure 20 and 21 as improperly joined.  The following Defendants are dismissed from this action:  Santiago, Barone, Harvey, Daniele, Swol, Konopelski, Stone, Vazquez, Zaidi, Ericson, Doe 7, Doe 8, Doe 9, Doe 10, Hite, Anglade, Bauza, Scott-Mailloux, Asmah, McDonald, Pillai, Doe 11, Dow, Melendez, Danik, Doran, Maldonado, Ogando, Burns, Scagliarni, Rodriguez, Quiros, Brennan, Salius, Rule, Santangelo, Jacovino, Doe 12, Doe 13, Bennett, Outar, Favreau, Laura, Doe 14, Lohmann, Rader, Titus, Dumas, and Bragdon.  If Plaintiff wishes to pursue his claims against these Defendants, he may do so in separate actions.

Plaintiff's deliberate indifference claim against Doe 2 is **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1).  Plaintiff's deliberate indifference claim based on RN Marceau's alleged failure to provide him with a stronger pain reliever than low dose Motrin is likewise **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1).

To the extent Plaintiff attempts to assert a First Amendment retaliation claim, this claim is **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1).

The Court declines to exercise supplemental jurisdiction over Plaintiff's state constitutional claim pursuant to 28 U.S.C. § 1367(c).  Plaintiff's claims for intentional and negligent infliction of emotional distress against Defendants Reynoso, Studalnik, Hill, Marceau, Lee, Graham, Naqvi, and Does 1 through 6 are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1).

The case can proceed on the following claims:  (1) Plaintiff's individual capacity Fourteenth Amendment excessive force claim against Officer Reynoso; (2) Plaintiff's Fourteenth Amendment failure to intervene claim against Lieutenant Studalnik; and (3) Plaintiff's remaining

Fourteenth Amendment deliberate indifference claims against Defendants Hill, Marceau, Lee, Graham, Naqvi, Doe 1, and Does 3 through 6, alleged in Count One.

Plaintiff has two options as to how to proceed in response to this Initial Review Order:

(1) If Plaintiff wishes to proceed on his Fourteenth Amendment excessive force claim against Officer Reynoso, his Fourteenth Amendment failure to intervene claim against Lieutenant Studalnik, and his remaining Fourteenth Amendment deliberate indifference claims against Defendants Hill, Marceau, Lee, Graham, Naqvi, Doe 1, and Does 3 through 6 alleged in Count One **only**, he may do so without further delay.  If Plaintiff selects this option, he shall file a notice on the docket on or before **March 6, 2023**, informing the Court that he elects to proceed with service as to the claims set forth in this paragraph.  The Court will then begin the effort to serve process on these defendants in their individual capacities.  The Court notes, however, that service cannot be ordered on Does 1 and 3 through 6 without those Defendants' full names and current addresses.  Accordingly, if Plaintiff chooses the option of proceeding with this suit as described in this paragraph, he will need to serve discovery requests on the other Defendants in order to identify the full names and mailing address of Does 1 and 3 through 6.  If he chooses to proceed with this suit as described in this paragraph, he must provide the full names and mailing addresses to the Court by filing a notice with that information by **May 4, 2023**.

(2) Alternatively, if Plaintiff wishes to attempt to replead any of the claims asserted in **Count One only** that have been dismissed above without prejudice, in order to attempt to state a viable claim, he may file an amended complaint by **March 6, 2023**.  An

41

Amended Complaint, if filed, will completely replace the Complaint, and the Court will not consider any allegations made in the original Complaint in evaluating any Amended Complaint.  The Court will review any Amended Complaint after filing to determine whether it may proceed to service of process of any defendants named therein.  If Plaintiff elects to file an Amended Complaint, the original Complaint this Initial Review Order addresses will **not** proceed to service of process on any defendant.

If the Court receives no response from Plaintiff by **March 6, 2023**, the Court will presume that Plaintiff wishes to proceed on the original Complaint as to the claims permitted to go forward in this Initial Review Order, and Plaintiff will have to show good cause if he seeks to amend the Complaint in any manner in the future.

**Changes of Address.**  If Plaintiff changes his address at any time during the litigation of this case, Local Rule 83.1(c)2 provides that he **MUST** notify the Court.  Failure to do so can result in the dismissal of the case.  Plaintiff must give notice of a new address even if he is incarcerated.  Plaintiff should write PLEASE NOTE MY NEW ADDRESS on the notice.  It is not enough to just put the new address on a letter without indicating that it is a new address.  If Plaintiff has more than one pending case, he should indicate all the case numbers in the notification of change of address.  Plaintiff should also notify Defendants or counsel for Defendants of his new address.

SO ORDERED at Hartford, Connecticut, this 3rd day of February 2023.

_/s/ Sarala V. Nagala_
SARALA V. NAGALA
United States District Judge

42